UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff-Appellee,

                                   Case Number 03-20004
v.                                  Honorable David M. Lawson

STEVEN M. FREUND,

          Defendant-Appellant.

_____/

## **OPINION**

The defendant, Steven Freund, appeals his conviction and sentence for cutting, destroying and removing timber growing on the public lands of the United States contrary to 18 U.S.C. § 1852. The case was tried before Magistrate Judge Charles E. Binder pursuant to a consent signed by the defendant on February 28, 2003. On appeal, the defendant raises four issues: (1) the trial court erred in including the aesthetic value of trees in its calculation of loss under U.S.S.G. § 2B1.1; (2) the government failed to prove by a preponderance of the evidence the amount of loss used by the trial court under U.S.S.G. § 2B1.1; (3) the trial court erred in not allowing the defendant to present demonstrative evidence and testimony about the number of trees he damaged for purposes of sentencing; and (4) the conduct of the government constituted reversible error. Finding no prejudicial error in the trial proceedings or magistrate judge's rulings, the conviction and sentence are **affirmed**.

I.

On January 15, 2003, a federal grand jury in Bay City, Michigan, returned a single-count indictment charging that "[o]n or about September 15, 2002 through October 28, 2002, inclusive, within the Eastern District of Michigan, Northern Division, Steven M. Freund, defendant herein, did

cut, wantonly destroy and remove timber growing on public lands of the United States, to wit: the Huron Manistee National Forest, with intent to dispose of same, contrary to Title 18 United States Code, Sec. 1852." The defendant pleaded not guilty and consented to trial before Magistrate Judge Charles E. Binder. The case was tried before a jury on July 15, 2002. On July 17, the jury returned a guilty verdict.

Testimony at trial revealed that on October 23, 2002, the United States Forest Service (Forest Service) received an anonymous phone call that someone was stealing cedar trees near Vaughn Creek (theft site one), which was United States public land located in the Huron National Forest. A follow-up inspection of the area revealed recent cutting of white cedar, approximately 51 trees according to the testimony of Officer Dallas Marroquin. The perpetrator had covered the tree stumps with moss and other vegetation apparently to avoid detection. On October 24, Officer Marroquin returned to the site along with Ronald Brouwer, a 23-year Forest Service criminal investigator. Upon arrival, Brouwer observed a freshly cut cedar log measuring 14 inches in diameter and twelve feet nine inches in length. Anticipating the perpetrator's return, Brouwer set up a hidden motion-activated camera and trained it toward the area the perpetrator would likely park.

When Brouwer returned a week later, he found fresh tire tracks and an indication that the security camera had been activated on October 28. The tape showed a middle-aged, white male flipping a large cedar log onto a red 2000 Chevy Silverado extended pickup truck and then leaving the site. Brouwer gathered up a short cut-off section near the stump for use in the investigation. He also measured and took sketches of the tire tracks. The white male was later identified as Steven M. Freund and the pickup truck belonged to him.

On November 5, 2002, Brouwer learned that Freund had sold timber to the Rustic Rails Mill in Sterling, Michigan. Brouwer took the cut-off obtained earlier in his investigation along with other evidence to the mill and met with the yard foreman, Kevin Sendo. Sendo directed Brouwer to the area where Freund had unloaded his logs. Using the evidence he brought with him from the site, Brouwer was able to match up several "cookies," which are samples of wood cut from the top of the stump. The match up involved comparing the top layer of the victim stumps to the bottom layer of the logs Freund had dropped off. The following day, a larger crew from the Forest Service returned with Brouwer and ultimately matched additional "cookies." Officer Marroquin explained that the matching procedure is straightforward: the investigator identifies the butt-end of the log, then takes the cookie cut from the top of the stump, and attempts to fit them together like a puzzle. The investigator can also compare the rings on the cookie to the rings on the log. At least three cookies were matched with logs on Freund's property, and several other cookies were matched with logs at Rustic Rails Mill.

On November 14, 2002, Brouwer interviewed Freund in Au Gres, Michigan, at Freund's place of employment. During the interview, Freund denied cutting cedar on Forest Service land. The cedar, Freund also explained, came from his own property. He said he had cut it with a Stihl model 032 saw and sold it to the mill. Freund further stated that he works alone; if the logs are particularly heavy, he loads them by flipping them from end to end. In the end, Freund estimated that he had sold over $20,000 worth of cedar to the mill in 2002. Freund also told Brouwer that he had a firewood permit from the Forest Service, but denied ever cutting wood west of Vaughn Creek Road near theft site one. Freund admitted owning a red pickup truck of which he was the only

driver, with rare exceptions. Brouwer took photographs of the truck and examined the tires in Freund's presence.

Freund explained to Brouwer that, in addition to cutting cedar on his own property, he had purchased cedar rails on six separate occasions from different saw mills. The cut cedar and the rails were the only lumber he hauled in his red pickup. On one occasion, however, Freund stated that he had seen a white stake truck come out of the woods loaded with what could have been cedar. After the interview, Brouwer reduced his notes to affidavit form and presented it to Freund for his signature and review on November 20. Freund, however, refused to sign the document. He requested several revisions. First, he wanted Brouwer to replace the sentence stating that Freund had never cut standing cedar on public lands with "I have never cut standing cedar on national forest land within the past two years." He also requested that saw model number be changed to Stihl 029 instead of 032. Finally, although Freund denied that he had ever cut cedar off of Vaughn Creek Road, he wanted the affidavit to reflect that he had in fact driven in the area of theft site one, explaining that he is a bird watcher and was attempting to photograph an owl in the area.

To ensure the accuracy of the revisions, Brouwer reviewed the affidavit almost line by line with Freund making notes throughout the meeting. That evening, Brouwer completed the revisions. Two days later, Brouwer met with Freund at Freund's residence to discuss the revisions and view first hand the cedar growing on Freund's property. Again, Freund refused to sign the affidavit, this time offering no reasons for his decision. Later that day, the two met again, but at Freund's other property in Iosco County. There, Freund showed Brouwer the cedar growing on his land; Brouwer noted several chunked-up sections of cedar. During the course of the day's discussions, Freund admitted that he had cut oak – not cedar – for firewood near theft site one, Freund also told Brouwer

that when attempting to photograph an owl near theft site one Freund accidentally sounded his horn while backing into a turn out. He then observed two men carrying chainsaws emerge from the creek and run off. Freund speculated that the two might be responsible for any illegal activities going on at the time.

In the same discussion, Freund recalled an encounter with a bicyclist en route to cut firewood near Vaughn Creek. Freund told Brouwer that he gave the bicyclist a ride and dropped him off near the theft site one. The bicyclist indicated that he was living in the woods and asked Freund if he would like to purchase cedar, any kind Freund might want. Freund told Brouwer about a second encounter with a second man, approximately thirty years old with medium-length hair, called "Willie." Freund met Willie at a gas station along the M-55 and M-65 junction. Willie asked Freund if he was interested in purchasing cedar. Freund explained that he agreed to purchase two loads of cedar logs. Willie drove a recent model brown Ford pickup and only accepted cash. Willie did not provide a receipt. Freund offered to help Brouwer by locating Willie. He acknowledged there was a possibility that the cedar Freund sold to the mill was "hot." After their discussions, Brouwer typed up Freund's additional statements.

In mid-November, the Forest Service discovered a second area where white cedar had been cut, located off National City Road approximately a five minute drive from Freund's property (theft site two). Initial estimates placed the number of felled trees between 80 and 90, and the condition of the stumps indicated that the cedar had been cut before the thefts at Vaughn Creek. Revised estimates placed the number of cut trees at 139. Like the stumps at the Vaughn Creek site, the perpetrator covered these stumps with moss and other natural debris. The Forest Service assembled cookies in an effort to match the stumps with the cedar logs. Officer Marroquin drove onto Freund's

property looking for cedar logs. While there, he observed and seized six butt ends – the bottom portion of the log that attaches to the stump. Out of the six ends, Marroquin was able to match three cookies.

The jury convicted the defendant as charged.

Sentencing hearings were conducted on December 2 and 9, 2003. The magistrate judge imposed a sentence of three years probation and ordered the defendant to pay $9,066 in restitution to the Forest Service. Testimony at those hearings revealed the following facts:

Larry Throop, a 29-year Forest Service veteran, testified to the valuation of white cedar for the purpose of determining restitution. Because the Forest Service has not commercially sold white cedar for several years, Throop explained his difficulties placing a true dollar value on it. Generally, the Forest Service uses two measures of damages in illegal cutting cases. The first measure comes from a liquidated damages provision used when the Forest Service contracts commercially for the right to cut timber on Forest Service land. The decision to include a liquidated damages provision, Throop explained, is determined nationally, but the amount of damages is determined locally based on prevailing market conditions. The liquidated damages amount consists of the market stumpage rate – the amount paid for the timber – plus an additional, reasonable amount used to deter illegal cutting. As a rule, the Forest Service sets the additional amount at between 1.5 and two times the average stumpage rate. In the past two years, the Forest Service determined the appropriate liquidated damage rate at between $75 and $500 in order to deter illegal timber cutting in its commercial contracts.

Although Throop was unable to determine the exact stumpage value of white cedar, he estimated that, compared to similar wood, the figure could be as high as $500. Because the Forest

Service had no data on white cedar, Throop used figures from the Rustic River Mill. Taking Rustic River's data, Throop converted aggregate values into a per tree figure. Because the average stumpage fees from his calculations were under $75, Throop set the value of white cedar at $75, a figure he considered conservative.

The second measure of damages comes from a calculation of commercial value based on a prevailing market rates and actual damages. Paragraph 17 of the pre-sentencing report (PSR) represents the Forest Service's valuation:

> A timber volume was determined by certified timber cruisers. From the theft site number one which involved 51 trees, 3.33 cords of pulp and 2.11 cords of saw timber were determined to have been taken. At theft site number two, involving 139 trees, 1417 cords of pulp and 1072 cords of saw timber were taken. Cedar saw timber was valued at . . . 200 dollars a cord and cedar pulp was valued at 100 per cord. The value of the stolen cedar was $4,316.

PSR, 17. Combining the actual and liquidated damages, the pre-sentencing report recommended Freund pay at total of $18,566 in restitution to the Forest Service. *Id.* The magistrate judge later revised the liquidated damages down to $25 per tree. Freund was sentenced to three years probation, including four months of home confinement, and ordered to pay restitution of $9,066.

II.

The defendant alleges four errors: three sentencing errors and a trial error attributed to the conduct of the trial prosecutor. The Court will address each in turn.

A.

The defendant first argues that the trial court committed sentencing error by including the aesthetic value of the trees in its calculation of loss under U.S.S.G. § 2B1.1. He references Application Note 3 of U.S.S.G. § 2B1.1, which states that loss does not include "non-economic harm," *see* U.S.S.G. § 2Q2.1 (Offenses Involving Fish, Wildlife, and Plants) (explaining that

sentence increase should be based on "market value" of fish, plants, etc.), and Application Note 4, which states that the market value "shall not be based on measurement of aesthetic loss (so called 'contingent valuation' methods)."

Calculation of the loss amounts in this case involved both legal and factual determinations. "Legal conclusions regarding the application of the Guidelines are reviewed *de novo*," while "findings of fact on sentencing, . . . will not be set aside unless clearly erroneous." *United States v. Gale*, 468 F.3d 929, 934 (6th Cir. 2006) (internal quotations omitted). Since the guidelines are now advisory, reviewing courts "must review all sentences – whether inside, just outside, or significantly outside the Guidelines range – under a deferential abuse-of-discretion standard." *Gall v. United States*, 128 S. Ct. 586, 591 (2007); *United States v. Mayberry*, 540 F.3d 506, 517 (6th Cir. 2008).

In this case, Judge Binder found that the base offense level was six under U.S.S.G. § 2B1.1(a)(2). The probation officer wrote a pre-sentence report recommending as follows:

> 17. A timber volume was determined by certified timber cruisers. From the theft site number one which involved 51 trees, 3.33 cords of pulp and 2.11 cords of saw timber were determined to have been taken. At theft site number two, involving 139 trees, 1417 cords of pulp and 1072 cords of saw timber were taken. Cedar saw timber was valued at . . . 200 dollars a cord and cedar pulp was valued at 100 per cord. The value of the stolen cedar was $4,316. Additionally, the U.S. Forest Service places the value of $75 per tree on timber illegally cut. This is a "damage factor" caused when undesignated trees are cut. One-hundred-ninety cedar trees were illegally cut, resulting in a value of $14,250.

> 18. The value of the timber was $4,316. The "damage factor" is calculated at $14,250. For loss and restitution purposes, $18,566 should be used. Restitution should be made payable to the U.S. Forest Service.

PSR ¶¶ 17-18. However, the trial court determined that although the defendant was accountable for 190 trees, it reduced the value of $75 per tree to a figure of $25 per tree. Therefore, a loss figure of

$4,750 was yielded for damage to the trees and cordage value for saw cut timber, and cedar pulp for the trees yielded a similar figure of $4,316, for a combined total loss of $9,066. *See* Sentencing Tr., 12/9/2003, at 46-48, 50. Therefore, under Section 2B1.1(b)(1)(B), this amount of loss resulted in a two-level increase, for a total offense level of 8. The defendant's criminal history category was I. Therefore, his guideline range was zero to six months in custody.

Section 2B1.1 defines "loss amount" as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 comment. (n.3(A)). Actual loss under this Guideline provision means "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 comment. (n.3(A)(i)). Intended loss means "(I) the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)." U.S.S.G. § 2B1.1 comment. (n.3(A)(ii)).

Application note 3 of section 2B1.1 further states:

The court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference.

The estimate of the loss shall be based on available information, taking into account, as appropriate and practicable under the circumstances, factors such as the following:
(i) The fair market value of the property unlawfully taken or destroyed; or, if the fair market value is impracticable to determine or inadequately measures the harm, the cost to the victim of replacing that property.
(ii) The cost of repairs to damaged property.
(iii) The approximate number of victims multiplied by the average loss to each victim.
(iv) The reduction that resulted from the offense in the value of equity securities or other corporate assets.
(v) More general factors, such as the scope and duration of the offense and revenues generated by similar operations.

U.S.S.G. § 2B1.1 comment. (n.3(C)).

It appears from the plain language of Section 2B1.1 that the aesthetic value of the trees in this case could not be considered in calculating the amount of loss attributable to the defendant, but there is no indication in the record that the trial court did so. Magistrate Judge Binder stated the following at the sentencing hearing when calculating the amount of loss attributable to the defendant:

> I must now determine for restitution purposes the remaining factors laid out in the – in the calculation of not only the number of trees but their amount and value.

> First, as to the value of saw cut timber and pulp timber, there has been no reasoned opposition put forward, even though these – the general calculations are controverted items. I will, therefore, find as correct the calculations made or the values rather, made of the saw cut and pulp timber that appear in the calculations, particularly paragraph 17 of the presentence investigation report.

> I similarly find no reasoned dispute with the number of cords that were determined by the timber cruisers, the results of which were testified to, both at trial and by Forest Service Agent Throop at the sentencing. I therefore adopt both the number of cords and the saw cut and timber value listed in paragraph 17.

> The remaining factor in the calculation is the so-called damage value. Paragraph 17, among other places, list that as $75 per tree. Forest Service Agent Throop testified concerning his calculation of that and the various factors that he used to arrive at that calculation including the, what I will call aesthetic values, the intrinsic values that he factored into this amount.
> . . .
> I know, however, also that the Government has conceded that there is within the $75 figure calculations of extrinsic value which they believe may not be appropriate – entirely appropriate under the circumstances. I tend to agree.

> As I view the calculations as laid out in the presentence investigation report, it seems to me that not only pulp and cordage amounts but this damage value could approach a double calculation of – of restitution, which I conclude is inappropriate.

> I therefore conclude that the $75 figure per tree listed in the – in paragraph 17 is not correct, inappropriate and too high. After consideration of all the factors which I have discussed, as reconsideration of Agent Throop's testimony or – both

at trial and here, I conclude that a damage factor in the amount of $25 per tree should be appropriate.

Sentencing Tr., 12/9/2003, at 46-48.

It is apparent that the magistrate judge clearly understood that aesthetic values should not be considered in calculating the amount of loss attributable to the defendant. There is no record support for the defendant's argument otherwise. The trial court's assessment of the actual value of the felled timber at $25 per tree is not clearly erroneous, and the trial court did not abuse its discretion in fashioning the sentence it did.

B.

Next, the defendant argues that the government's evidence failed to prove the loss amount used by the trial court by a preponderance of the evidence. Here, the defendant maintains that the evidence did not support the court's determination of the number of trees the defendant cut down because, he says, the government's evidence was speculative.

The government bears the burden of proving the applicability of the offense level enhancement under Section 2B1.1 of the Federal Sentencing Guidelines by a preponderance of the evidence. *See United States v. Finkley,* 324 F.3d 401, 403 (6th Cir. 2003). "Because the amount of the loss is a question of fact, we must affirm the district court's finding as long as it is not clearly erroneous." *United States v. Comer*, 93 F.3d 1271, 1285 (6th Cir. 1996) (citing *United States v. Moreno*, 933 F.2d 362, 374 (6th Cir. 1991)). "'A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Ibid.* (quoting *United States v. Perez,* 871 F.2d 45, 48 (6th Cir. 1989)).

The trial courts' finding regarding the amount of loss was not clearly erroneous. At trial, the forestry officers testified that 51 trees were removed from theft site #1. An additional 139 trees were cut from theft site #2. The stolen trees were counted and recorded. Victim logs matched at the mill were measured. Timber volume was approximated by certified timber cruisers. In the days and weeks following receipt of the anonymous theft tip, 159 stumps were discovered. At the sentencing hearing, the court commented on this evidence and stated:

> The – the jury after a trial found the Defendant guilty of violation of 18 U.S. Code Section 1852. The Defendant's arguments and continual emphasis upon the – the timber that was said to be moved or moved frm one place to another or moved to the Rustic Trails location I conclude fundamentally misapprehends the verdict returned by the jury. The verdict found the Defendant guilty of this charge and to subscribe to the arguments made by the Defendant would negate this finding of guilt on the first words of the statute, which says, "Whoever cuts or wantonly destroys any timber." Were I to follow the Defendant's line of logic, I would be completely disregarding that portion of the statute. I cannot. The jury found the Defendant guilty of a violation of this statute.

> That verdict was imposed beyond a reasonable doubt. I, however, am at the sentencing stage. And for – and for the purpose of restitution, the standard is preponderance of the evidence.

> As I view the trial testimony and in particular the testimony of Agent Brouwer and Marroquin, the testimony relating to the tools found in – the saw cutting tools found at Site 2, the cut patterns found throughout and the tools missing from the Defendant, I conclude that all the trees of both Sites 1 and 2, should be attributed to the Defendant for the purpose of calculating restitution.

> I note further that the arguments made by the Defendant relating to Site 2 are further undercut by paragraph 15 of the presentence investigation report, to which neither party objected. There is no controverted item as to paragraph 15, which states that theft Site Number 2 was closed for all purposes, including the collection of what is called dead and down wood. That, however, determines only one portion of a much larger calculation.

Sentencing Tr., 12/09/03, at 45-46.

The trial court in this case succinctly summarized the trial evidence relating to the offense level enhancement and found that the number of stolen and cut trees was established by a preponderance of the evidence. There was no error in this determination.

## C.

The defendant also contends that the trial court erred by not allowing the defendant to present demonstrative evidence and testimony at the adjourned date for the sentencing hearing to show the number of cut and stolen trees attributed to him. At the sentencing hearing, the defendant attempted to introduce into evidence photographs and videotapes of sites from which the trees were illegally cut in order to show that many of the trees were not cut but had been blown down. The court, however, ruled that evidence inadmissible. In addition, on November 18, 2003, after the sentencing hearing had been rescheduled several times by the court, the defendant submitted an *ex parte* application for seven witnesses to appear at sentencing, which the court granted. The government objected to the subpoena for Officer Brouwer because the subpoena required him to bring his case notes and "entire file" to the sentencing hearing. The government objected to the subpoena for Dallas Marroquin pursuant to 7 C.F.R., Part 1, subpart K, on the grounds that this witness did not have permission from the government agency he works for (U.S. Forest Service) to leave his training post in Georgia. The government filed a motion *in limine* asking the court to compel the defendant to articulate specific reasons for causing the remaining five subpoenas to issue (one of the five witnesses did appear at the sentencing hearing to testify). The court took the motion under advisement after oral argument, and later determined that the evidence from the witnesses were irrelevant to sentencing.

A trial court's decision to exclude evidence at a sentencing hearing is reviewed for an abuse of discretion. *See United States v. McGahee*, 257 F.3d 520, 530 (6th Cir. 2001). "A [trial] court is considered to have abused its discretion when this court is left with the definite and firm conviction that the district court committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *United States v. Trujillo*, 376 F.3d 593, 605 (6th Cir. 2004) (citations omitted). This Court reviews a trial court's decisions regarding the relevancy of evidence for abuse of discretion. *See United States v. Talley*, 164 F.3d 989, 1000 (6th Cir. 1999).

"A sentencing hearing . . . is not a criminal trial, and many of the constitutional requirements of a criminal trial do not apply at sentencing." *United States v. Christman*, 509 F.3d 299, 304 (6th Cir. 2007) (quoting *United States v. Hamad*, 495 F.3d 241, 246 (6th Cir. 2007). Nonetheless, "Congress prefers the inclusion rather than the exclusion of information at sentencing, *see* 18 U.S.C. § 3661 ('No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.'). . . ." *Hamad*, 495 F.3d at 246.

Federal Rule of Criminal Procedure 32, which governs sentencing and judgment, "contemplates full adversary testing of the issues relevant to a Guidelines sentence." *Burns v. United States*, 501 U.S. 129, 135 (1991). Rule 32 requires disclosure of pertinent sentencing information, *United States v. Hayes*, 171 F.3d 389, 392 (6th Cir. 1999), and it directs that the sentencing court "must allow the parties' attorneys to comment on the probation officer's determination and on other matters relating to the appropriate sentence." Fed. R. Crim. P. 32(i)(1)(C). These ideas are repeated in U.S.S.G. § 6A1.3, which states:

> When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court

regarding that factor. In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.

*See also United States v. Silverman*, 976 F.2d 1502, 1511 (6th Cir.1992) (en banc). Of course, the sentencing court also may consider evidence adduced at trial in fashioning its sentence.

In this case, the sentencing court found that the photographs and videotape the defendant sought to offer either were cumulative of the trial evidence or were not trustworthy. The Court held:

> As to the photographs of the logs, that is Exhibits – I have them as 206 through 218, and as to the transcript excerpts proffered, I first of all conclude that as to the – as to the transcripts, I cannot say that they were inaccurate nor is the proffer of transcripts per se an inappropriate procedure at sentencing. However, I can, as to these matters, come to no other conclusion but that they are also an attempt to re-litigate the testimony presented to the jury as well as the exhibits entered into evidence during the trial.

> As to the proffered videotape – I believe it is Exhibit 202, although I may stand corrected as to the number – I conclude that it is, first of all, cumulative, and more important, again a – a direct effort to re-litigate matters brought – presented to the jury and determined by the jury at trial. I fully realize that the Rules of Evidence do not apply in sentencing proceedings. Even with that relaxed standard, I could not and will not find the videotape admissible. It has no sentence – sentencing relevance, as I stated earlier.

> In addition, it is entirely lacking in any indicia of independent corroboration of its authenticity. Except for depictions of some numbers on tree stumps which match testimony at trial, there is no independent corroboration of the location that is being videotaped or is being viewed. There are gaps in the videotape. There is no independent corroboration of the date and time except the voice of the Defendant.

Sentencing Tr., 12/9/03, at 40-43.

There is no requirement that a videotape must have "independent corroboration" to be admissible at a sentencing hearing. But it is apparent that the sentencing judge considered – and rejected – the photographs and videotape because he determined it untrustworthy. That conclusion

is based on sound reasoning, and there is no abuse of discretion in the sentencing court's rejection of that evidence.

Nor is there any error with respect to the seven witnesses the defendant wanted to present at the sentencing hearing. In granting the government's motion *in limine*, the court stated that Officer Brouwer would not be required to bring his "case notes and entire file" as requested by the defendant. The order does not preclude Brouwer from testifying. That decision is not clearly erroneous because the defendant did not make a showing of relevancy regarding the entire file or the officer's case notes. The magistrate judge also quashed the subpoenas previously issued for witnesses Dallas Marroquin, Ronald Cloum, John Bain, Thomas Bain, Leroy Conley, and William Baker after finding that the "testimony of these witnesses will not assist in the determination of any of the controverted items set forth in the Presentence Investigation Report." Order, 11/26/03, at 2. Some of these witnesses testified at trial, and the court could consider that evidence at sentencing as well. The defendant never indicated how the witnesses' testimony would assist in the sentencing determination. The magistrate judge actually denied the government's motion as to defense witness Scott Adams. No error occurred in these determinations.

D.

Finally, the defendant contends that the government's attorney during the course of the trial made improper comments, vouched for the evidence, expressed an opinion on the credibility of a witness, and misstated the evidence, all of which denied the defendant a fair trial. The government argues that the defendant has taken the prosecutor's comments out of context and the comments were not improper.

In reviewing a claim of prosecutorial misconduct, this Court must first determine whether the statements at issue were improper. *United States v. Modena*, 302 F.3d 626, 634 (6th Cir. 2002); *United States v. Carroll*, 26 F.3d 1380, 1387 (6th Cir. 1994). If found to be improper, this Court must then determine if the impropriety was flagrant under *United States v. Leon*, 534 F.2d 667 (6th Cir. 1976). In *Leon*, the court provided four factors to assist the court in making the second determination. The factors are: "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused." *Carroll*, 26 F.3d at 1385. If the defendant failed to object to the comments below, then this Court must decide, under the plain error test, "whether the comments were sufficiently flagrant to warrant reversal of the defendant's conviction despite his failure to object to them at trial." *Modena*, 302 F.3d at 634; *see also United States v. McConer*, 530 F.3d 484, 500 (6th Cir. 2008).

First, the defendant argues that the prosecutor made the following improper comment in closing argument:

> Mr. Brunson [the prosecutor]: Next, the defendant amended his statement about cutting Cedar on Forest Service land. Version A, on the 14th of November, the defendant had said I never cut Cedar on Forest Service land. Version B, on the 20th of November, the defendant said I have not cut standing Cedar on National Forest Service land in the last two years. Well, in other words, what he was admitting is that two years ago he had done it before; cut Cedar on National Forest land. You can't do that.

> Mr. Crews: [defense counsel] Judge, I object. That's not relevant at all to these proceedings; what may or may not have happened two years ago. That certainly has no relevancy to these charges. The charges are between September 15 and October 28th, on or about those dates.

> The Court: Ladies and gentlemen, let me remind you again that the arguments of counsel are not evidence, and – and that they are not the determining factor as to your decision-making. I will instruct you as to the law.

And Mr. Brunson, you may continue.

Mr. Brunson:  Thank you, Your Honor.

> In other words, ladies and gentlemen, according to what came from the defendant's own lips, he said yeah, I haven't cut standing Cedar on National Forest land in the last two years.  And so, ladies and gentlemen, what we have heard is a statement that he has done it on a previous occasion.  And we contend to you that he went back on and he was doing it in the middle of September, roughly until the end of October of last year.

Trial Tr. III at 18-19.

This comment was not improper.  As the government points out, the defendant apparently changed his statement to Officer Brouwer and the government's comments above were merely stating evidence admitted at trial.  The government did not dwell on the defendant's prior illegal conduct.  *See Cristini v. McKee*, 526 F.3d 888 (6th Cir. 2008).  Moreover, "[t]he Federal Rules of Evidence permit an advocate to use a witness'[s] prior inconsistent statements to attack that witness'[s] credibility."  *United States v. Allen*, 155 F. App'x 229, 233 (6th Cir. 2005) (citing Fed. R. Evid. 613(b) and *United States v. Foster*, 376 F.3d 577, 591 (6th Cir. 2004)).

Next, the defendant argues that the prosecutor, knowing the defendant lived in Gladwin several miles from the theft sites, argued in his closing statement that "the defendant lived minutes from both of the theft sites . . ."  Trial Tr. III at 11.  The government states in its brief that this comment was incorrect but argues that it was inadvertent.  The Court agrees with the government that the comment, although incorrect, was accidental and harmless.

Next, the defendant argues that the prosecutor improperly vouched for the evidence.  In reference to a videotape shown to the jury, the prosecutor stated:

> You saw the tape, ladies and gentlemen.  You saw it one time.  Officer Brouwer and I have seen it a lot of times.  It won't be thrust at you.  You don't have to look at it again.  You might not need to look at it again.  But I submit to you that you will find

it helpful, or may find it helpful, to look at that tape at least one more time during the course of your deliberations. But that's something that's commended to your capable hands, and that's all I will say about that.

Trial Tr. III. at 13. With regard to the evidence in general, the prosecutor stated:

But of course as you think about all of the evidence in this case, as I and Officer Brouwer, Officer Marroquin and others involved in the case have over the past months as we have been coming towards the trial here, when you look at all of the evidence in this case, and you talk about it as a group, ladies and gentlemen, I believe you will see that all of the evidence supports itself, reinforces itself.

*Id*. at 11.

These comments do not constitute vouching for the evidence. The prosecutor merely is suggesting to the jury that it should view the evidence as the government sees it. The comment did not imply any special knowledge on the part of the government or its agents, and it did not refer to matters outside the record.

Next, the defendant argues that the prosecutor improperly shifted the burden of proof to the defendant. The government argues in response that it was entitled in its rebuttal argument to respond to the defendant's allegations in the defendant's closing argument. In his closing statement, the defendant stated the following:

Next I'd like to discuss for a moment that log number one over there on the table that the Government, through Mr. Brouwer, says came from that log that was there at Vaughn Creek that's on the video. Okay. Now what I find interesting about that. Please understand, you're the trier of fact. This is a serious criminal case. You have the right to expect the best evidence so things are not left to speculation and conjecture. What do we have? We have Mr. – Officer Brouwer saying oh, it's a match. That matches up, folks, to what I found there at the mill. Well, you know, we got all kinds of cookies. They went through a great deal of trouble to show us pictures of these Forest Service guys there at Site 1 and Site 2 cutting the stumps and saying how hard that was because, you know, some might be down to dirt level or whatever. Okay, so that's what they did. We're buried with these cookies. And yet the one significant cookie that is under their control, is those logs at the mill, the debarked log. And all you got to do, obviously, is cut off an end. That's all it takes. They went through – they went to the forest and cut all these cookies, and yet they

did not go to the mill and bring in a cookie. Don't have to bring in the whole log, obviously, just the cookie so you could see; so you could determine if it's a match. I suggest that since this is – and certainly we're talking about the Government. They've got the resources to do it. They've got the know how to do it. They did it there at Site 1 and Site 2. Please remember that a reasonable doubt can come from the evidence or the lack of evidence. The evidence was in their control. So just like Officer Marroquin, when he was showing us these matches and the heart and all that stuff. Same thing, if it's true, could have been done regarding that Number 1 really simply so we're not speculating. And this is a criminal case, and I suggest we have the right to expect evidence that's within the Government's control. And if it doesn't show up, you draw your own conclusions.

Trial Tr. III at 39-40.

The prosecutor responded by stating the following in his rebuttal argument:

Mr. Brunson: And also, ladies and gentlemen, we saw a little bit here of the argument, the way it was presented to you here a few moments ago, and there's nothing at all improper about this whatsoever. But it's the old let's try the police tactic. Why didn't Brouwer – why didn't the Forest Service bring down – instead of bringing down the wood that we have brought down here, why didn't you bring down the one big Cedar log, cut down in two segments, so that you, ladies and gentlemen, could see for yourselves if there was a match? Why did you just have to rely on the witness' testimony? Well, ladies and gentlemen, although the defense has no obligation to present and produce evidence[,] I can, because my opponent made the argument to me, comment in rebuttal to it within the rule. Why didn't he ask Agent Brouwer those questions yesterday?

Mr. Crews: Judge, for the record I object. We don't have any burden to do anything. Just – so I think that's improper.

The Court: Mr. Brunson, I believe the issue had been argued by both sides to the jury.

Mr. Brunson: Thank you, Your Honor. And similarly, if the defendant really wanted to have that piece of wood down here to make a comparison, he could have brought it down and introduced it himself.

Mr. Crews: Judge, I'm sorry. Same argument. It's continuing.

The Court: Mr. Brunson, same instruction. I believe the jury is understanding of both your views and – both sides as to this matter.

Mr. Brunson: Very well, Your Honor.

Trial Tr. III. at 51-52.

This court does not believe that the government's argument amounted to an effort to shift the burden of proof on the issue of the defendant's guilt. But even if it was, the statement was not flagrant under the test set forth by the Sixth Circuit in *Leon*. The remarks amounted to a fair comment on the defense criticism of the government's choice in bringing to court only a part of a cumbersome exhibit – a white cedar log from a felled tree. *See United States v. Newton*, 389 F.3d 631, 638 (6th Cir. 2004) (finding no misconduct in prosecutor's reply to defense insinuations that government hid evidence from the jury); *United States v. Bond*, 22 F.3d 662, 669 (6th Cir. 1994) (finding prosecutor's comments about lack of alibi witnesses did not warrant reversal); *United States v. Beddow*, 957 F.2d 1330, 1336-37 (6th Cir. 1992) (prosecutor's comment about failure of defendant's brother to testify in support of defendant's claim that brother loaned him money did not warrant reversal); *Traylor v. Price*, 239 Fed. Appx. 235, 242 (6th Cir. 2007) (stating "the prosecutor is permitted to comment on the improbability of the defendant's theory once a defendant makes an issue legally relevant by advancing that theory"). Moreover, the strength of the evidence against the defendant in this case cured any defect caused by the remarks. The U.S. Forest Service conducted an extensive investigation including video surveillance that furnished abundant evidence of the defendant's guilt. No error resulted from the prosecutor's comments concerning the availability of the evidence to the defendant.

Next, the defendant argues that the prosecutor improperly referred to him as a "thief." In his opening statement, the prosecutor stated:

> Mr. Brunson: Remember, I mentioned this prize log, this twelve foot, nine-inch log out in the woods? And so Marroquin and Brouwer together tried to determine as

best they could, make an estimate of where it is that the thief would likely be able to back up his pickup truck and then load that log into it?

Mr. Crews:  Judge, I object.  I'm sorry.  I object to calling the person that had took [sic] the log a thief.  As it will come out in evidence, certainly there are valid reasons that people take logs from the national forest through permits, and without being a thief.  And so I think that that remains to be seen during the course of this trial, if the person who took it is a thief.  But in the opening statement to call that person a thief I vehemently object to.  I think it's a misnomer.  And I think as the trial progresses and we get to the end of the trial, it will be obvious that the person that took the log in fact is not a thief.

The Court:  Mr. Crews, I don't know what will come out as obvious in this case.  But, Mr. Brunson, would it be fair description that what you're describing, at least at this point in your opening statement, is a suspect?

Mr. Brunson:  I will use the word suspect, Your Honor.

The Court:  All right.  Very [w]ell.  Ladies and Gentlemen, again recall the Government's summary, as are other arguments and objections, are not evidence.  Mr. Brunson, please continue.

Mr. Brunson:  Thank you, Your Honor.  And so Officer Brouwer and Officer Marroquin positioned their camera so that when the suspect appeared to gather up the prize log . . .

Trial Tr. I at 18-19.

Once again, this comment is harmless and not prejudicial to the defendant.  Even if the comment were improper, the court's instruction to the jury cured any prejudice to the defendant that could have resulted.

Finally, the defendant raises in passing some arguments at the end of his brief that the government failed to follow up on the defendant's claims that someone else was the perpetrator in this case and that during his testimony, Officer Brouwer referred to notes that were not seen by the defendant.  The defendant offers no record support for these contentions.  Because the defendant failed to raise these arguments below, they are waived.

The Court finds that the conduct of the prosecutor does not require reversal and a new trial.

III.

The Court finds no error in sentencing or at trial that requires vacating the conviction or sentence in this case. Accordingly, the conviction and judgment of sentence are **AFFIRMED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: October 14, 2008

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 14, 2008.

s/Felicia M. Moses
FELICIA M. MOSES